The Fourth District Appellate Court of the State of Illinois has now convened, the Honorable Robert J. Steigman presiding. Thank you. This second case today is case number 419-0314, Marsha et al. versus Sandstone North, LLC et al. And for counsel for the appellant, please state your name for the record. Ralph Davis, Your Honor. Thank you, Mr. Davis. And counsel for the appellee, please state your name. Charles Insler. Thank you, Mr. Insler. We have a cross appeal in this case. So the way things will work is Mr. Davis will speak first on behalf of the appellant. Then Mr. Insler will speak on behalf of the appellee. Then Mr. Davis will have a rebuttal argument where he will be able to speak. And then because of the cross appeal, we will give Mr. Insler an opportunity to speak during cross appellant's rebuttal. Which should be limited to the issues raised in the cross appeal. So without further ado then, Mr. Davis, you're given an opportunity to proceed and you may do so at this time. Thank you, Your Honors. Counsel, I'd like to advise the court that I have no control over it, there's some construction going on directly above my office and another office. If it becomes a nuisance, please tell me. I've checked the audio and it seems as though it's not coming through my microphone, but please advise me if it does. Well, thank you for advising us. At the moment, you look fine and sound fine. No problems with that. Hopefully it won't create a problem. Okay, well, let's hope so. I'd like to start today by first correcting a misstatement in my reply memorandum. If you look to page 16, I wrote, quote, the Tovey court stated, dot, dot, dot, quote, and that was an error. What I should have written is that the Tovey court stated the appellant's position. But I'd like to add on to this that the defendant, appellant in this case, described my quote as misleading, and it is not. And it's because of the structure of the Tovey decision. Specifically, the way the Tovey decision is structured, the court stated the appellant's position first and then reviewed what the lower courts said in rejection of the position. Then the high court overruled those lower courts, essentially affirming the appellant's position. And it makes it for a hard read, but what it amounts to is that the position that was quoted on page 16 appears to represent what the court was endorsing. Second, I'd like to regarding the Illinois Farm Nuisance Act, the defendant's appellants here said that I used a black quote and didn't support it. I'd like to draw the court's attention to the way my argument is structured, and it's in two parts, part A, part B. Part A laid out what the standard of the court is. And then in the second part, I showed how the circuit court followed that standard. Now, I'm not going to repeat it here because it's there in full, but the cross appellant here argues that I should forfeit the argument because I used a black quote. If you look at how long the entire argument is, by doing it the way I did, I made it very efficient. It consisted of just slightly over three pages and laid out all of the salient points. Third, I'd like to point out that throughout my arguments, in the main, my arguments were based on the application and law and constitutionally that's based on the highest courts of the jurisdiction, the Illinois Supreme Court and the United States Supreme Court. The defendant appellants make liberal use of decision of courts foreign to the court. For example, I'd like to point to page three of the defendant appellants reply brief in which they cite the case Zink. It's a Wisconsin case to stand for the proposition that the creation of a farm replacement exception is against the purpose of the Farm Nuisance Act. But Zink bottoms out on the purpose of the Wisconsin Farm Nuisance Act statute. And it's in the case. And if you look at those purposes, they're different. I'm going to just direct us to the Illinois statute, because the Illinois statute expressly recognizes non agricultural encroachment as a source of the problem that the statute is intended to solve. The Wisconsin statute points to technology and the development of farms. Now those are different. And more importantly, the defendant did not show this court how the Zink decision should be persuasive here. And lacking that I don't know how it can be persuasive. Now, the defendants also make references to other foreign authority. And I'm not going to go through them because they liberally use foreign authority. But uniformly, they don't establish how that authority specifically applies to this case in hand. I'm going to turn to federal court authority on the the constitutional issues under the United States Supreme Court. The court should look at my briefs and see again, that I relied exclusively on United States Supreme Court authority. And the defendant appellants who accuse us of not paying attention to their authority, and the federal cases that they cite, I'd like to direct this court to look at it and see that all of them are from federal district court decisions. Federal district court decisions do not have precedential authority. I didn't cite that in my brief because I didn't believe I had to do that. But I'll provide you with a citation today that shows that there is no precedential authority in lower district court decisions. And that's F3, 358, Seventh Circuit, 1998, Judge Posner. Fourth, and I think this is important, because the defendant appellants have made repeated attempts to say that we had waived our opportunity to give notice to the Attorney General on a constitutional issue. And I'd like to point out that the case that the defendant appellants most rely on for that very case undercuts their argument. That case cites Messenger-Viega, an Illinois Supreme Court case, saying that one must have sustained or, and it's the emphasis in the case, be in immediate danger of sustaining direct injury as a result of the enforcement of a challenge statute in order for Rule 19 to come into effect, for us to give notice to the Attorney General. We gave notice to the Attorney General twice. Once, literally days after the defendant appellees filed, or excuse me, defendant appellants filed their petition for fees. And if it's filed within days, that's got to be timely. For safety purposes, once the court decided that the Farm Nuisance Act didn't apply, and therefore that statute wouldn't apply for purposes of fee shifting, once the defendant appellants filed their notice of appeal, again, within days, we gave another notice to the to the Attorney General's office. The first acknowledgement of the Attorney General's receipt of our Rule 19 notice appears in the record and is cited in my brief. The second one for notice that is for this appeal is in the appendix of my brief, or rather in my reply brief, because that's when I replied to the to the defendant appellants appeal. So, there's another question that if this court were to accept the defendant appellee's proposal about how to construe rule 19, it would really be a poor public policy. Because if all of us were to follow the rule as defendant appellants say that we should, it would cause multiple filings or notices to the AG's office for potential constitutional challenges that would never materialize. And what that would do is that the AG's office resources would, in part, be used to have to respond to these notices as they did with ours. But if they never materialize and they never become something that places the person giving or the party giving notice to have either sustained an injury or be in immediate danger of sustaining direct injury, then it would be a waste of the government's time. It is also, I think, important that if you look at the rule 19 itself, it also recognizes that an appropriate time for filing rule 19 would be after there was a ruling or some decision either at the circuit court level or on a revealing court and that appears in the rule itself. Next, I'd like to argue that the defendant's position, the constitutional questions are ripe for review. They will only be ripe for review if this court does not arrive upon a resolution that does not implicate the Illinois United States Constitution. If this court decides either on the basis of our appeal that there should be a new trial or to remand it back to the circuit court or this court finds a resolution of the application of the Farm Nuisance Act without reaching the constitutional questions, it would moot the necessity for ever going to reach a constitutional decision at this time. And it would also coincide with the basic rule of constitutional avoidance. It's also important that in constitutional cases, if there is no constitutional case in controversy, there's no rightness. And so there's got to be a case in controversy and if this court moots the constitutional issue before we reach them, there's no case in controversy. I'd like to highlight some other points about our direct appeal. Our first big issue is regarding Kelly Howard, a juror. Defendants' appellants now argue that there was no authentication of her Facebook entry. But if you look at the record as it's supplied, and as we pointed out, they didn't object at the circuit court level. And lack of an objection constitutes a waiver. And I cited this in the case, my Supreme Court case, Lemke v. Kenilworth Insurance, and it basically says that something that wasn't raised as an objection at the circuit court level can't be raised for the first time upon review. So whether or not it was authenticated or not, it's too late for defendant appellants to make that assertion. Moreover, had the circuit court required authentication, then it would have been appropriate at the circuit court level to call for an evidentiary hearing on just what Kelly Howard said and did. And that would in fact then bring in authentication of her Facebook entry. That would also solve the problem, which has the same problem for defendants appellants, is that it's inadmissible hearsay. They didn't argue that at the circuit court level. They took it for what it was, argued on what was expressed in the Facebook entry, and didn't raise any objection whatsoever as to inadmissible hearsay. One other thing is that the defendant defendant appellant say is that there was no prejudice. Well, rather than go through our argument about what prejudices are expressed inside her remarks in the Facebook entry, such as sympathy for the farmer, admission that she shouldn't have been a juror, what this court can look to with rock-bottom certainty is that by her expression in that Facebook entry, she established that she shouldn't have been a jury, and shouldn't have been on the jury, and that the plaintiffs were denied a jury of 12. Now, nobody is ever going to know what happened inside that jury room. Mr. Davis, let me ask, let me ask you a question about that. What consideration should we give to the fact that this Facebook post came at a time after the juror had heard the evidence, you know, deliberated, and obviously rendered a verdict. Does that have any place in our consideration? Well, to the extent that it happened afterwards, of course, it's something that you would consider. But what it does is it reflects on what she did while she was a juror. How so? Well, if you look at her quote, she says, as I've been saying for the last three weeks, her entry was made within a couple of hours of the time the jury verdict was entered, which means that the three weeks prior, she was talking to somebody by her own admission about this case. Is it possible she was thinking that? Throughout the trial, not necessarily communicating that to someone, thinking that? Well, I'm not going to deny that she may have been thinking it, but what she said in the Facebook entry, literally what she expressed, was that that's what she'd been saying all along. Now, if she'd been saying it all along, there must be a recipient to her speaking. Not who that is, whether it's fellow jurors, people at home, we don't know. But if you look at that, there is an admission that she was talking about the case during the tendency of the case. And so that's, you know, the fact that she did it afterwards, if it was merely that she said, well, I think it was decided the right way or things like that, but she expressed her own views that showed prejudice and she did it within a period of time that was during the trial. I hope that answered your question. I guess we have to agree to disagree. I think another take on it could be that she just expressed her thoughts of the evidence and the position of the parties that she gleaned from participating in the trial as a juror. Well, we know some of the things that she said in that Facebook post could not have come from the trial. Specifically, she makes reference to the wealth of the plaintiffs. Now, was that mentioned at all during opening statements or anything from the attorneys? I believe there is some indication and maybe, I think this is what opposing counsel mentioned in his brief, that there was some discussion about that. Well, it wasn't about their wealth but there was discussion about one couple, two of the plaintiffs, who have a business and are employers in that county. So there was that, but the Likes and the Barnetts have substantial land holding in that area, and the amount of their acreage and things like that were not discussed. Their wealth, their income was not discussed. And so, if you take her expression at face value, it looks to me as though she's making reference to a number of the plaintiffs. And in that section of the country, farmland along the river bottom that isn't sandy is worth a lot of money. Now, whether she came to that conclusion on her own, it was not part of the trial. I hope that answered your question. Thank you. If I may, I'll move on to another issue. The adverse instruction issue. The IPA, IPI 5.01. Our argument is, Mr. Davis, your time is up. You'll have an opportunity to address us again in rebuttal. So, Mr. Insler, you may make your argument at this time on behalf of the FLE. Thank you. Thank you, Justice. So, on May 24th, 2016, a jury of plaintiff's peers rejected their claims that the defendant's hog farming operations constituted a private temporary nuisance. Now, the plaintiffs asked this court of appeals to reverse that jury verdict, and that would be a severe sanction. This was a three-week trial that featured testimony from 10 separate plaintiffs. There is no indication from any of the plaintiffs' arguments on appeal that this court should sanction the severe sanction of reversing that verdict. All of the plaintiff's arguments are governed by the abuse of discretion standard, and there is nothing in their briefing that would indicate that Judge Cherry abused his discretion when he denied their motion for a new trial. If we turn to the Facebook post at issue, that was allegedly posted by one of the jurors, Kelly Howard. That post has not been authenticated. If you look at Kent from the Second District. Mr. Insler, did you raise that at the trial court level? Did you contest the validity or the authenticity of the Facebook post? We didn't have to, Your Honor, because they never admitted it into evidence. The Facebook post is simply an exhibit in their briefing. So, there was no occasion for the circuit court to either admit it or not admit it into evidence. Did you make arguments regarding the Facebook post? There are general arguments, yes, Your Honor, about the Facebook post. And did you argue that it was not authenticated? No, not below. Okay. But this court always has the ability to affirm on any basis supported by the record. And if you followed the Kent decision from the Second District, the Facebook post has not been authenticated. And it was never admitted into evidence, so there was no basis to argue whether or not it should have been admitted into evidence. Now, Mr. Davis says, well, the court could have had a hearing. Yes, the court should have had a hearing. They should have argued it and tried to admit the post into evidence, and they should have had a hearing where they could have put on evidence and testimony about whether Drew Howard had, in fact, authored that post. Because under Kent, it's not enough that the Facebook post has her name and photograph on that Facebook post. If you look to Kent, it says anybody with an email address who's 13 years old can create a Facebook account. You need other indicia of authorship before you consider a Facebook post. And so we don't think that this court can even consider the Facebook post because it's never been authenticated. It's also hearsay. It is being used simply for the truth of the matter asserted without any other authorship. And I'd like to actually turn the court's attention to the Facebook post itself, and that's in the record at C-2386. And the post begins, Some people amaze me. For the last three weeks, 22 days to be exact, I, along with 13 other people, had to put our lives on hold. It's not saying that for the last 22 days, she's been talking to the jurors about the case. In fact, for the last 22 days, she has been strictly adhering to her civic duty of ignoring outside influences, of not reading the newspaper, of putting her life on hold. She didn't go on vacation. Her attention was on this case and that's exactly what Judge Cherry had asked her to do. Now, when Judge Cherry excused the jurors after they rendered their verdict, that prohibition no longer applied. Their First Amendment rights came into play and they were free to discuss the case as they saw fit. Now, increasingly, that means discussing something online, on the internet, and possibly on Facebook. And we all know that Facebook, the means of communicating on Facebook, is a looser style of communication. And so when she describes her comments as a rant, that may be what it was, but that's her expressing what she found the case to be, and I think she expresses that. She said that, you know, paraphrasing, the case may have been long on days, but short on evidence, and that's that's how she came to her determination. So there's no evidence of any bias in that post. And I think Mr. Davis is confusing the issues when he says, well, she was prejudiced toward certain issues. That's not what prejudice means. It's prejudice to the outcome of the case. So he has to show that she was biased and that there was a resulting prejudice from that. And there's never been any showing of prejudice to the outcome of this case. Now, you raise the point of whether or not it matters, whether this came after the verdict or before the verdict, and it absolutely matters. That's the kinetic case. Kerwick, and it says it's significant when a Facebook post comes after the verdict, and that's exactly because when the jurors are listening to the evidence, they are not to be on Facebook. They're not to be looking at other news outlets. But once the verdict is rendered, they have every right to discuss the case and look online and read the newspapers. And that's exactly what Judge Howard, Juror Howard was allegedly doing. Now, I'd like to turn to our cross appeal. And Judge Cherry denied our motion for attorney's fees under section 4.5 of the Foreign Nuisance Suit Act. And we believe that was an error. And this error is reviewed de novo because we're looking at the interpretation of the statute. And it's never okay to read into the statute exceptions or limitations that are not found within the statute's plain language. The court appeals duty is to simply interpret the language within the four corners of the statute. And if we start with the statute itself and look into section 4.5, it begins in any nuisance action. And this was a nuisance action. But in Judge Cherry's opinion, he found that this, he held that this was a negligence action. And that is, that is an illegal error. Everything about this case made it a nuisance action. Every iteration of the plaintiff's complaints began with the first allegation. This is a private temporary nuisance case brought by 10 plaintiffs and list of plaintiffs. Now the nuisance theory permeates throughout the case and throughout the trial during a summary judgment hearings in the record at R-86. Judge Cherry himself says this is a nuisance case. The plaintiff's counsel repeatedly states this is a nuisance case. We're looking for nuisance damages. The verdict instruction that went to the jurors related to whether or not there was a private temporary nuisance. The testimony of trial related to the plaintiffs, 10 of them, describing how the defendant's farming operations interfered with their enjoyment of their property. They testified to how the defendant's hog farming operations interfered with their ability to garden, to have cookouts, to socialize with neighbors. Those are all nuisance theories. Those are not negligence theories. They're describing the ways in which the defendant's property allegedly interfered with their ability to enjoy their property. Those are all nuisance theories. There's some reference to negligence in the jury instructions, but that is in a definitional sense because part of the Farm Nuisance Act, section three, has a refers to the coming to a nuisance doctrine which would bar plaintiffs from coming to a nuisance and complaining of the nuisance, as long as the farming operation has been an operation for a year. Now there's an exception to section three and that is in cases where the defendant's hog farming operations are being operated negligently. So there is a place for negligence because it's an exception to the coming to the nuisance bar found in section three. But there's no reference to nuisance found, there's no reference to negligence found in section 4.5 And there's nothing about this case that makes it a negligence case, even when you consider the exception found in section three. Now, when we turn to the other provisions of the statute. There is the language shall and shall means shall. It's obligatory. That is from the Supreme Court's Robinson decision. When the section 4.5 says we, the court, shall award fees, there is no permissive approach there. That is obligatory. And we cite to Zink and we cite to Aguiar from the Wisconsin and Texas Courts of Appeals because those are the two states that have right to farm statutes that are nearly identical to Illinois'. There's several iterations of these fee provision, fee shifting provisions. Illinois has mandatory fee shifting in favor of the defendant when they prevail. Texas and Wisconsin also have those two provisions. Oklahoma and Oregon, for instance, have mandatory fee shifting to either prevailing party. Indiana and Louisiana and Missouri all have frivolousness requirements. So there's very, there's different iterations of the statute and all 50 states have a right to farm statute. But because Illinois is so similar to the statutes found in Wisconsin and Texas, and this is a matter of first impression interpreting section 4.5, we think looking to Aguiar and Zink is particularly appropriate. And the second district has also found that it's particularly appropriate to look to other states' right to farm statutes. In the Village of Chadwick decision at paragraph 17, when they're interpreting section 3 of Illinois' farm nuisance suit act, they look to the right to farm statutes from other states, including Idaho and other related states. So it's absolutely appropriate and the court of appeals has frequently referred to other states' right to farm statutes. Another error that Judge Cherry made was when he read into the Illinois farm nuisance suit act an exception that does not appear within the statute provisions. He said that section 4.5 did not apply because it did not pit a non-agricultural interest against an agricultural interest. And that's both factually unsupported and legally irrelevant. At trial, plaintiffs testified that they had lost the enjoyment of their right to farm or, I'm sorry, of their right to cook or garden or socialize with neighbors. There was never any testimony that the defendant's hog farming operations had interfered with their ability to engage in their agricultural pursuits. They were complaining about enjoying their property, but they were never complaining that they were unable to engage in their own agricultural pursuits. Now, this is also legally irrelevant because that exception does not appear anywhere in the statute. And the Wisconsin Court of Appeals in Zink, interpreting essentially the same statutory provisions, found that there was not even a hint of what the plaintiffs wanted to call a plaintiff farmer exception. And in HMSL in Indiana, at note 12, the Indiana Court of Appeals, interpreting its right to farm statute, says that when a plaintiff complains about non-farming uses, that there's no exception, that you cannot create a plaintiff farmer exception. And Judge Cherry was in error when he did that in denying our motion for fees. The purpose of the right to farm statute is to promote and protect Illinois' agricultural resources. That's in section one of the statute. And farming is a difficult business with thin margins. The average farmer does not have a legal budget. They don't have reserves for litigation.  legal budget is not an issue. Legal fees in a nuisance case ran to two million dollars. The average, it would be a rare farmer that had that kind of reserve. So section 4.5 is rationally related to the underlying goal and policy goals of protecting and promoting Illinois agriculture. It disincentivizes nuisance suits, and that's a perfectly permissible objective from the General Assembly. The Village of Lafayette case says that Illinois is an agricultural state. Most of southern Illinois has farms on its property. Now some of the confusion may be coming from section 3, which does include that reference to negligence. But as I noted earlier, section 3's purpose is to codify the coming to the nuisance doctrine. It doesn't create or doesn't make a nuisance case into a negligence case. And so all the pieces of the Illinois Farm Nuisance Sued Act, they fit together. And section 4.5 was passed 14 years after the general provisions of the Right to Farm Act were passed. It is consistent with general principles of statutory interpretation. Section 4.5 is the specific provision and that will govern over the general provisions that may be found in section 1 or section 3. It's never okay or proper to read into a statute exceptions that are not there. And the statute reads coherently and cohesively together. All the provisions build off of each other. Section 4, in fact, references section 3, but section 4.5 does not. It stands on its own. And it says, in any nuisance action, and we think that language, in any nuisance action, stands on its own. This is a nuisance action. The plaintiff's brought a nuisance action and they they are now, having brought this nuisance action and having lost under the plain language of section 4.5, they must now essentially suffer the consequences. That there is no permissive approach here, that a fee award is absolutely obligatory and that this court should remand to the circuit court to determine what exactly was a reasonable fee. There's argument that section 4.5 is unconstitutional because it usurps fiduciary's authority, but that argument would invalidate dozens of Illinois statutes. The right to farm statute is not the only fee shifting statute. And I think Judge Easterbrook's opinion in the Premier Electric case is particularly fitting where he says the very notion that the Constitution has anything to say about fee shifting is too far-fetched to be given serious analysis. Illinois has, if not hundreds, dozens of fee shifting statutes. And the idea that a mandatory fee shifting statute comes up against the constitutional prohibition would imperil all these statutes. And just looking back, we start from a premise that a statute is constitutional. And the party opposing the statute on constitutional grounds has a very heavy burden against that presumption. And there is no indication that the plaintiffs have met that burden. One of the things they would like to do is to say that section 4.5 burdens a fundamental right. That is not the case. Now, if you burden a fundamental right, you're subject to strict scrutiny, and that's what the plaintiffs are going for, rather than the more lenient rational basis review. But if you look to the Marks decision from the Illinois Supreme Court, that's where they explicitly state that there is no fundamental right to property. That is not subject to strict scrutiny. And that's a recent decision from the Illinois Supreme Court. So this court doesn't need to look back, you know, hundreds of years to cases from, you know, the 19th century to what the constitutional law might be. It only has to go back to the Marks decision from the Illinois Supreme Court where it says there's no fundamental right to property. That is not a strict scrutiny analysis. And so the section 4.5 would easily survive rational basis review, because when you look to section 1, it states the policy goals to promote and protect Illinois agricultural resources. And section 4.5 does that. And the General Assembly doesn't have to do it in the best possible way. They can do it by half measures. They can do it in ways that this Court of Appeals may think don't make any sense. But as long as the goals are rationally related to the underlying purpose of the Farm Nuisance Suit Act, section 4.5 survives the constitutional attack. And it's certainly a rational, there's certainly a rational basis for promoting agriculture when you disincentivize nuisance suits by awarding fees when those nuisance suits are not meritorious. Thank you. If I may, I will yield the rest of my time. Okay, thank you, counsel. Mr. Davis, can you rebuttal, sir? Let me turn, yes, I'm turning off my unmute. Okay, go ahead. I would like to talk about the adverse inference instruction. That's where we left off the last time. What the court did was it came to a conclusion without making a finding. And the finding that it did make usurped the job of the jury. Namely, he found Brian Bradshaw, the operator of Sandstone North and South, as being credible as a witness. But that's really the jury function because paragraph 4 of Instruction 5.01 leads it to the jury to decide whether there was a reasonable excuse for the failure. Mr. Davis, may I interrupt you for a moment? Sure. Can you explain to us how it is that 5.01 is even implicated under the circumstances here? Easily. We only got one opportunity to inspect the property and that's where the hogs had been giving thrown off orders. There was other evidence showing that there were hogs lying on top of the ground at an earlier time. And we asked for an inspection. It was delayed two or three times. When we got there, they had cleaned up the entire property. And what is telling is that they picked up bones. Now, while it's true that bones themselves don't throw off an order, it's circumstantial evidence that those bones belong to a live animal as it decomposed. And then that would have given off orders and it would have contributed to the evidence. And since it was under the exclusive control of Brian Bradshaw, his cleaning up the operation and saying, oh, we just want to make it nice for when we have visitors. It actually was taking evidence away from what we had originally arranged for. Well, it may be that if I point to the first element of 5.01, this will direct you to exactly what it is I'm concerned about. That first element is that the evidence was under the control of the party and could have been produced by the exercise of reasonable diligence. What evidence was under the control of the defendants that could have been produced at trial by the exercise of reasonable diligence? Well, it's not the evidence that the evidence we were after was the opportunity to look at the property to see what the conditions were and that would have been evidence at trial. That evidence was taken away. And so that was deprived of the plaintiffs to produce as evidence at trial. It sounds like you're describing a spoliation claim of sorts. Of sorts, yes. But that's different and distinct from 5.01, which is a missing evidence instruction. Had they not cleaned up the property, we would have had an opportunity to see evidence of decayed carcasses. Was there an order directing them to preserve the premises in a certain condition? There was no order. Was there a discovery violation where you requested some sort of photographic evidence of the conditions as they existed at the time of the events described in the complaint? Well, I don't have it in front of me, Your Honor, but there was in fact a request for us to inspect the property for evidence of decayed animals. Okay, thank you. I don't know how much time I have left. About a minute. A minute? Well, in that case, one of the instructions has an absolute misstatement of the law. And that instruction is, I believe, instruction number 17. And in there, it states as one of five factors that coming to the nuisance is to be a factor to be considered in that instruction. That's incorrect. Under Illinois law, section three of the Farm Nuisance Act, it is a bar to a nuisance action. So it's not just a factor. And so  it's a mistake in the judge's recitation of the law in that instruction. And I'll rest on that because I don't think I have much more time. That's correct. Thank you, counsel. Mr. Insler, because of your cross appeal this time, you may make a rebuttal argument that should be limited to the issues raised in your cross appeal if you wish to do so. Yes, Your Honor. I can just briefly note some of the reasons why the constitutional challenge does not merit serious attention. There was three challenges to the constitutionality of section 4.5. The first is under the special legislation clause. The second was under equal protection, and the third was under the separation of powers. The special legislation clause, that generally prohibits laws that would impact one group and one group only to exclusion of others similarly situated. Section 4.5 does not exclude anybody similarly situated. It would apply to any farming operation anywhere in the state, no matter how big or no matter how small. One of the arguments that plaintiffs made was that it favors nuisance actions over other types of actions. But that is not a special legislation problem. A statute may certainly favor or fee shifting provision may certainly favor one cause of action over another without running into the special legislation clause issue. Equal protection analysis is the same analysis because it also is determining whether or not provision is rationally related to a compelling, rationally related to an objective. And as I noted earlier, section 4.5 is rationally related to the goals and policies of the Farm Nuisance Student Act. The separation of powers argument overlap is certainly allowed between the different branches of government. And we see this all the time. There are mandatory minimum fines for civil penalties and violations of ordinances. There are mandatory minimum sentences for criminal penalties and criminal statutes. The Illinois statutes dictate what can be admitted into evidence. So there are numerous examples where the General Assembly has passed a statute that confines the courts to certain decision-making processes. Now, there's still the relief valve because the Circuit Court will ultimately have the discretion to determine what is a reasonable fee under section 4.5. And so there's no separation of powers problem by section 4.5. And there's no constitutional problem at all. And not come even close to rebutting that heavy presumption of constitutionality. And I will, if the Justices don't have any other questions, I will yield my time. I see none. So thank you, Counsel. The Court will take this matter under advisement and stand in recess at this time.  Thank you.